### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVID MYERS and JEAN TWENGE, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> MCGRAW-HILL EDUCATION, INC. <br><br> Defendant. | Civil Action No.  1:21-cv-1141 <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs David Myers and Jean Twenge on behalf of themselves and all others similarly situated ("Plaintiffs"), for their Complaint against defendant, McGraw-Hill Education, Inc. ("McGraw-Hill"), state as follows:

### NATURE OF THE ACTION

1.      Plaintiffs and members of the putative class are professors and leading academics who authored academic textbooks and entered into contracts with McGraw-Hill (or its predecessors-in-interest) to publish, sell, and distribute Plaintiffs' textbooks ("Publishing Agreements").

2.      The Publishing Agreements each require that McGraw-Hill pay Plaintiffs royalties on the net receipts from the sale of their works.  McGraw-Hill, however, has recently adopted a class-wide policy of systematically deducting revenues received from the sale of works available on its digital Connect platform to reduce the royalty base available to authors, shorting authors the royalties they are owed and enriching McGraw-Hill at the authors' expense.  McGraw-Hill's financial alchemy violates the terms of the Publishing Agreements.

3.      McGraw-Hill describes itself as a "digital learning company that draws on its more than 100 years of educational expertise to offer solutions that improve learning outcomes around the world."  According to McGraw-Hill, it is "the adaptive education technology leader with the vision for creating a highly personalized learning experience that prepares students of all ages for the world that awaits."

4.      In 2009, McGraw-Hill launched what it called a "robust new platform for college faculty and students," called McGraw-Hill Connect ("Connect").  It explained that Connect "bridges the printed page with a dynamic online learning environment," and boasted that "[f]rom practice questions and homework problems to quizzes and exams—McGraw-Hill Connect integrates media-rich e-books, study tools, and assessments all in one place."

5.      Electronic textbooks sold for Connect have been wildly successful. McGraw-Hill has used the sale of electronic textbooks to steadily increase the number of instructors and students who use Connect.  In 2020 alone, McGraw-Hill Connect amassed over 4.4 million unique users, and McGraw-Hill's higher education digital revenue represented 74% ($463 million) of all higher education revenue earned by McGraw-Hill.

6.      For the past 10 years, McGraw-Hill has paid royalties to authors based on the entire sales price of electronic textbooks sold for Connect. McGraw-Hill's practice of paying royalties based on the entire sales price complies with the terms of the Publishing Agreements, which require McGraw-Hill to pay royalties based on the "net receipts" of each textbook sold. The practice also comports with the terms of the Publishing Agreements that require McGraw-Hill to publish textbooks "at its own expense."

7.      In December 2020, over 10 years after the introduction of Connect, McGraw-Hill announced that it would no longer pay royalties to authors based on the entire sales price of an

electronic textbook sold for use on Connect. Instead, McGraw-Hill says it will only pay royalties on a portion of the money McGraw-Hill receives for the sale of the electronic textbook. According to McGraw-Hill, it will unilaterally determine the "relative value" of the electronic textbook, the Connect platform, and technology available on the Connect platform, and pay royalties only on the portion of the electronic textbook that McGraw-Hill says it attributes to the electronic textbook. As a result, McGraw-Hill now systematically deducts the net receipts from which royalties are calculated and paid to authors who sell textbooks for use on Connect.

8.     McGraw-Hill's recent royalty-reducing payment method directly contradicts the terms of the Publishing Agreements, which require royalties to be paid on the net receipts of each textbook sold, and require McGraw-Hill to bear the cost of publishing textbooks. It also contradicts McGraw-Hill's longstanding practice of paying royalties on the entirety of revenues received for textbooks sold for Connect. In essence, McGraw-Hill is assessing an electronic platform fee on authors' royalty accounts, something found nowhere in its Publishing Agreements with authors.

9.     Traditionally, the higher education industry has ***not*** deducted from the royalties owed to authors the cost to publish and market a hardcopy of a work. For example, the industry has not reduced the royalty-bearing revenues for a hardcopy work by the costs of paper, printing, and binding that work. The industry also has not reduced the royalty-bearing revenues for the large number of sales representatives, client representatives, consultants, and operating expenses necessary to market and sell textbooks.  This is for good reason: the Publishing Agreements, which entitle McGraw-Hill to the overwhelming majority of the money it receives from textbook sales (typically between 80 and 90 percent, sometimes more), already account for McGraw-Hill's contributions to the final product, *e.g.*, binding, marketing, editing, and printing.

10.    In the digital age, the functionality that enables McGraw-Hill to publish and sell electronic textbooks for use on Connect (without the need for a bookstore) is the functional equivalent of yesterday's paper, printing, and binding. Such functionalities are part of putting forth an electronic version of a work.  The consulting, operating, and administrative expenses necessary to create and delivery digital functionalities for electronic textbooks are likewise components of publication costs.

11.    For over a decade, McGraw-Hill has recognizing such functionalities as a cost of publication. That is why McGraw-Hill's annual reports have repeatedly explained that "the costs associated with design and content creation for both digital and print products" are treated "as a component of operating and administration expenses." McGraw-Hill now double counts its so-called contributions to the sale of the textbooks, and improperly uses publishing functionalities to deduct revenues that make up the royalty base for author's works.

12.    However, it is the sale of the author's works that drive the revenues McGraw-Hill receives for Connect. While McGraw-Hill offers students a free 14-day trial period for Connect when the student registers for a course at school, the student must first purchase a textbook from McGraw-Hill before the student may access the full functionalities available on Connect. Indeed, the student must purchase the textbook to obtain a 20-digit access code to use Connect, and the access code itself is coursebook specific, *i.e.*, the access code will only work for functionalities related to the specific textbook the student purchased. Functionalities related to other courses may only be accessed with another purchase of a McGraw-Hill textbook. Thus, the textbook drives the revenue McGraw-Hill receives—not Connect.

13.    Again, the Publishing Agreements require payment of royalties on the net receipts from sales of student texts and McGraw-Hill is, at a minimum, obligated to pay royalties on all of

the money that McGraw-Hill receives for the sale of an authors' textbook. In other words, when McGraw-Hill charges $100 for a textbook, whether sold in-print at a bookstore, in-print on its website, digitally by itself, or digitally for Connect, McGraw-Hill is obligated to pay authors royalties based on the entire $100 that McGraw-Hill receives.

14.    For this reason, the royalty statements that McGraw-Hill sends to authors clearly state that the royalty method for domestic sales is the "Received Price." Whether the sale is for a loose leaf, hardcopy, ebook, or Connect version of the textbook, the royalty rate is supposed to be applied to the price McGraw-Hill received for the sale.

15.    Rather than paying authors pursuant to the terms of their contracts, McGraw-Hill now says it will stop paying Plaintiffs royalties on net receipts from sales, as the Publishing Agreements require. This class action therefore alleges a breach of contract for damages due to McGraw-Hill's uniform violations of its Publishing Agreements. The success of new digital sales channels for academic textbooks (which ultimately reduce McGraw-Hill's distribution and sales expenses) is not an excuse to somehow start cheating textbook authors and violating their binding contracts.

## THE PARTIES

16.    Professor David Myers is an author of *Social Psychology* and *Exploring Social Psychology.* Professor Myers entered into an agreement with McGraw-Hill dated July 30, 1979 for the publication of *Social Psychology*, and has subsequently amended the agreement to cover multiple editions of the textbook.  Professor Myers also entered into an agreement with McGraw-Hill for the publication of *Exploring Social Psychology.* Professor Myers resides in Michigan.

17.    Professor Jean Twenge became a co-author of *Social Psychology*, starting with the thirteenth edition, and a co-author of *Exploring Social Psychology*, starting with the ninth edition.

Professor Twenge entered into agreements with McGraw-Hill dated May 19, 2017 and March 25, 2020 for the publication of *Social Psychology*.  Professor Twenge also entered into an agreement with McGraw-Hill dated May 18, 2019 for the publication of *Exploring Social Psychology*. Professor Twenge resides in California.

18.     Defendant McGraw-Hill Education, Inc. is a New York corporation with its principal offices in New York.  McGraw-Hill is an education and technology company that serves the higher education, K-12, professional, library, and workforce training markets worldwide.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332(d) because this is a class action with diversity between at least one class member and one defendant and the aggregate amount of damages exceeds $5,000,000.  This action therefore falls within the original jurisdiction of the federal courts pursuant to the Class Action Fairness Act, 28 U.S.C § 1332(d).

20.     This Court has personal jurisdiction over McGraw-Hill because Defendant is registered to do business in the State of New York, maintains an office at 2 Pennsylvania Plaza in New York, and events giving rise to this lawsuit occurred in New York.  Upon information and belief, McGraw-Hill markets and sells *Social Psychology*, *Exploring Social Psychology*, and other authors' works in New York; and has sold and continues to market and sell Connect versions of the works in New York.

21.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)-(c) because events giving rise to the causes of action occurred in this District.

**FACTUAL BACKGROUND**

22.    McGraw-Hill is the leading provider in the market for new instructional materials in the approximately $3.4 billion U.S. higher education learning solutions market.

23.    In higher education, McGraw-Hill is a top-three provider in the U.S. higher education market with a 24% market share.

24.    Over time, McGraw-Hill has migrated many of its offerings from textbooks to digital solutions.

25.    McGraw-Hill sells its higher education solutions to well-known online retailers, distribution partners and college bookstores, who subsequently sell to students.  McGraw-Hill increasingly sells via its proprietary e-commerce platform, primarily directly to students.

26.    As reported by McGraw-Hill, its portfolio of traditional print products developed over 125 years and built around market leading titles has been the foundation of its transformation into a large and growing digital learning solutions provider.

27.    McGraw-Hill's top 10 product categories represented over 50% of industry net sales in 2018.  This market leadership has uniquely positioned McGraw-Hill to extend its portfolio of traditional print products by offering digital alternatives and new digital solutions that incorporate McGraw-Hill's existing content and curriculum.

28.    For the years ended March 31, 2020 and 2019, higher education digital revenue represented 74% ($463 million) and 64% ($423 million), of McGraw-Hill's total higher education revenue, respectively.

A.    **McGraw-Hill Connect**

29.    Over the last decade, McGraw-Hill has penetrated and lead the market with McGraw-Hill Connect.  Connect is an electronic platform through which a student can access an

electronic version of a textbook, along with homework, quizzes, tests, and multimedia materials. Connect also provides feedback and analytics for instructors and students.

30.     Connect is one of McGraw-Hill's core digital learning platforms.  Over 4 million higher education students and instructors used Connect in 2020.  This is a significant increase over the approximately 3 million higher education students and instructors who used Connect in 2016.

31.     In 2009, when McGraw-Hill first launched Connect, it described Connect as a "robust new platform for college faculty and students" that "bridges the printed page with a dynamic online learning environment."  McGraw-Hill explained that "Connect integrates media-rich e-books, study tools, and assessments all in one place" with "practice questions and homework problems to quizzes and exams."

32.     In 2020, McGraw-Hill continues to describe Connect as "a homework and learning management solution" that integrates "eBooks, course and assignment set-up tools" with assessment, grading, and reporting tools, all in one place.

33.     Connect is offered for most core freshman and sophomore level courses in the U.S. with 4.4 million users across campuses nationwide during the year ended March 31, 2020.

34.     Even with McGraw-Hill Connect, substantially all of McGraw-Hill's higher education revenue is generated from approximately 2,000 individual titles, including print and digital formats, with no single title accounting for more than 2% of revenue.

35.     McGraw-Hill's longstanding and exclusive relationships with textbook authors make Connect possible, and provide McGraw-Hill the exclusive right to produce and distribute such content during the applicable copyright term.

B.     **Publishing Agreements**

36.     McGraw-Hill and its predecessors-in-interest entered into Publishing Agreements with authors regarding publication rights to textbooks and other works.

37.     Under these Publishing Agreements, authors are paid a royalty percentage based on net receipts from the sale of their works. The remainder of the revenue is kept by McGraw-Hill.

38.     For example, the original *Social Psychology* Agreement provides: "the Publisher shall pay to the Author the following royalties . . . 12.5 percent of the Publisher's net receipts from each copy of the Work sold by the Publisher for use within the United States."  The most recent *Social Psychology* Agreement provides: "[t]he Publisher will pay the Author a royalty of 15% of the Publisher's net receipts from the sale of print, custom and electronic editions of the Work."

39.     The term "Work" is defined as *Social Psychology* "or such other title as may be mutually agreeable to the Publisher and the Author." According to royalty statements, McGraw-Hill sells an author's Work under multiple titles. For example, the Work authored by Professors Myers and Twenge is sold under the following titles: *Social Psychology*, *EBook Online Access Social Psychology*, *Connect Online Access Social Psychology*, *Connect Access Social Psychology*, *Inclusive Access EBook Online Access Social Psychology*, and many other titles.

40.     The term "Publisher's net receipts" is defined as "the Publisher's selling price less discounts, credits, and returns, or a reasonable reserve for returns."  This means that under the terms of the Publishing Agreements, McGraw-Hill may not deduct development, marketing, or publication costs from the "Publisher's net receipts."

41.     Indeed, the Publishing Agreements clearly state that "[a]fter giving written notice to the author that it has accepted the Work as being in form and content satisfactory for publication,

the Publisher shall publish the Work ***at its own expense*** at such time and in such style and manner"
as it shall deem suitable.

42.      In other words, when calculating royalties, McGraw-Hill may not deduct operating
or administration expenses, like the costs associated with design and content creation for digital
and print products, from the net receipts McGraw-Hill receives for the sale.  Instead, McGraw-Hill
is obligated to pay royalties based upon the amount of money McGraw-Hill receives for each copy
of the work, whether sold in print, digital, Connect, or loose leaf format.

43.      The royalty statements that McGraw-Hill sends authors further demonstrate this
point.  The royalty statements explain that the "Royalty Method" for domestic sales of the work is
McGraw-Hill's "Received Price" for the work, whether the work is sold in hardcopy, loose leaf,
eBook, Connect, inclusive access, access card, or rental format. No matter what format or
distribution platform McGraw-Hill chooses to sell the author's work, McGraw-Hill must pay the
author royalties based upon McGraw-Hill's selling price, *i.e.*, the amount of money McGraw-Hill
receives for the sale.

44.      For example, when McGraw-Hill sells a print, digital, Connect, or access card
version of a textbook for $100, McGraw-Hill is contractually obligated to pay the author a
percentage royalty based on the $100 that McGraw-Hill receives.  If the royalty rate is 15% for a
domestic sale of the work, then McGraw-Hill must pay the author a $15 royalty based on the $100
McGraw-Hill receives, and under the Publishing Agreements, McGraw-Hill is permitted to keep
the (much larger) remaining $85 dollars it receives for the sale.

45.      As contemplated by the Publishing Agreements, authors only receive a small
fraction of the net receipts, while McGraw-Hill keeps the lion's share of every dollar it receives.

McGraw-Hill is then permitted to put that lion's share into the costs of development, marketing, and publication "at its own expense," or pocket its lion's share of receipts as profit.

46.     McGraw-Hill, however, is not permitted to take money out of the pockets of textbook authors, so that McGraw-Hill's (much larger) lion can eat more than its rightful share. That is nowhere permitted in the Publishing Agreements.

47.     Instead, all Publishing Agreements contain a substantively identical royalty payment calculation that provides for: (1) a royalty rate, applied to (2) the amount of money McGraw-Hill receives, from (3) the sale of the work—no matter what format, title, delivery platform, or access code McGraw-Hill chooses to use for the sale of the work.

### C.     McGraw-Hill's Unlawful Manipulation of Authors' Royalty Base

48.     For more than a decade, McGraw-Hill has purported to pay royalties to authors based on the entire sales price of electronic textbooks sold for Connect.  McGraw-Hill's practice of paying royalties based on the entire sales price complies with the terms of the Publishing Agreements, which require McGraw-Hill to pay royalties based on the "net receipts" of each textbook sold.  The practice also comports with the terms of the Publishing Agreements that require McGraw-Hill to publish textbooks "at its own expense."

49.     In December 2020, over 10 years after the introduction of Connect, McGraw-Hill announced that it would no longer pay royalties to authors based on the entire sales price of an electronic textbook sold for use on Connect.  Instead, McGraw-Hill said it would only pay royalties on a portion of the money McGraw-Hill receives for the sale of the electronic textbook.  According to McGraw-Hill, it will unilaterally determine the "relative value" of the electronic textbook, the Connect platform, and technology available on the Connect platform, and pay royalties only on the portion of the electronic textbook that McGraw-Hill says it attributes to the electronic textbook.

50.     In an email to all of its authors on December 18, 2020, McGraw-Hill said "it was only recently that McGraw Hill had an objective way of determining the relative value of the three components of the Connect product (*i.e.*, the ebook, the platform, and the course-specific content and technology accessed through the platform, which we refer to as CCC)."

51.     As a result, McGraw-Hill announced that "Effective with this current royalty period," July through December 2020, the royalty paid for electronic textbooks sold on Connect will be systematically reduced:

> Effective with this current royalty period, the royalty for sales of the ebook within the Connect product will be paid on the revenue attributed to the ebook component, determined proportionally based on the stand-alone list price of the ebook of corresponding duration to the Connect product divided by the list price of the Connect product.  In addition, a permissions fee attributed to the CCC component will be paid for the re-use of the ebook content in McGraw Hill's SmartBook technology within the same Connect product.  The revenue attributed to the CCC component will be any revenue not attributed proportionally to the ebook or platform components.

52.     McGraw-Hill's new royalty-reducing methodology systematically deducts the net receipts from which royalties are calculated and paid to authors who sell textbooks for use on Connect.  In essence, McGraw-Hill is assessing an electronic platform fee on authors' royalty accounts, something found nowhere in its Publishing Agreements with authors.

53.     McGraw-Hill's new royalty-reducing methodology is a vast departure from its longstanding practice of treating costs associated with design and content creation (for both digital and print) as components of operating and administration expenses, as opposed to independently valued products that reduce the royalty bearing revenue associated with textbook sales.

54.     As recently as March 31, 2020, and consistent with its longstanding practice, McGraw-Hill's annual report explains that costs associated with print and digital products, such as Connect, are treated as expenses—not independently valued products:

A significant component of our total operating and administration expense relates to our ongoing investment in DPG [the Digital Product Group].

. . .

***Costs associated with design and content creation for both digital and print products are capitalized as a component of pre-publication expenditures.*** Capitalized pre-publication expenditures are subsequently amortized as a component of operating and administration expenses.

. . .

Outside of costs directly associated with DPG, we incur additional digital related costs, including content tagging and digital solutions hosting, which have increased as the digital transformation continues. The Company relies primarily on internal resources to develop the Company's digital platform, host the Company's digital solutions and tag the Company's digital content, and ***these costs have no clear attribution to specific products or services and do not directly correlate to sales of products or delivery of services. As a result, the Company has classified these costs within operating and administrative expenses.***

55.     McGraw-Hill's long-standing practice of treating costs associated with design and content creation (for both digital and print) as operating and administrative expenses is entirely consistent with the terms of the Publishing Agreements. McGraw-Hill's recent tactics are not.

56.     McGraw-Hill's recent royalty-reducing payment method directly contradicts the terms of the Publishing Agreements, which require royalties to be paid on the net receipts of each textbook sold, and require McGraw-Hill to bear the cost of publishing textbooks.   It also contradicts McGraw-Hill's longstanding practice of paying royalties on the entirety of revenues received for textbooks sold for Connect.  For over a decade, an author would receive a royalty based on the entire net receipts of an electronic textbook sold for use on Connect, including access to functionalities available on Connect.

57.     With McGraw-Hill's new policy, that has changed.   Under the new policy, McGraw-Hill deducts from an author's royalty base the amount that McGraw-Hill unilaterally attributes to the value of its investment into the Connect platform and the course-specific-content made available on Connect. For example, if an electronic textbook is sold for use on Connect for $100, the author will no longer receive a royalty based on the entire $100 McGraw-Hill receives.

58.     Instead, McGraw-Hill will deduct amounts it traditionally attributes to development expenses associated with Connect from the $100 McGraw-Hill receives for the sale, then McGraw-Hill will apply the author's royalty rate to the amount that remains after the deduction.  This new policy will retroactively apply to the July 1 to December 31, 2020 royalty period.  But McGraw-Hill's new policy is nowhere permitted in the Publishing Agreements.

59.     Again, the Publishing Agreements require McGraw-Hill to pay royalties based upon the "Publisher's selling price," *i.e.*, the entire amount of money McGraw-Hill receives for the sale, no matter the format, title, or delivery platform McGraw-Hill chooses to use for the sale.

60.     Nothing in the Publishing Agreements permits McGraw-Hill to deduct amounts from the "selling price" royalty base to which authors' royalty rates are applied.  The authors' royalty rate (say of 15%) already provides McGraw-Hill the lion's share of the revenue, including revenue to pay for any expenses or work it contributes to the sale of the work.

61.     McGraw-Hill does not even make Connect materials available for sale separate and apart from the textbook.  Instead, Connect functionalities are only accessible by purchasing or accessing the textbook.  Indeed, the major Connect functionalities, such as integrated eBooks, course and assignment set-up tools are all course-specific and tied to the text of the book.  To the extent that McGraw-Hill has attempted to sell the Connect functionalities separately, those functionalities have little to no market value when sold separate and apart from the textbook.

62.     All of the Publishing Agreements, like all contracts, also contain an implied covenant of good faith and fair dealing, which prohibits McGraw-Hill from taking action that undermines the authors' benefits under the Publishing Agreements.  McGraw-Hill may assert that it has discretion to determine the form in which works are sold, the sales channel through which

they are sold, and the price at which they are sold. McGraw-Hill has exercised this discretion in an arbitrary, bad-faith manner.

63.    McGraw-Hill has destroyed the fruits of the Publishing Agreements by calculating amounts from McGraw-Hill's "selling price" royalty base from which royalties are calculated differently (and detrimentally to Plaintiffs) simply because the works are sold for use on Connect. In addition, McGraw-Hill has arbitrarily assigned "value" to materials that substantially undercut the royalty base attributed to authors.

64.    Thus, even if McGraw-Hill is permitted under the Publishing Agreements to deduct from authors' royalty bases the "relative value" of other elements that McGraw-Hill unilaterally included with the sale of the authors' works—McGraw-Hill is still in breach of the Publishing Agreements because it is not fairly or accurately ascribing portions of McGraw-Hill's "selling price" as royalty-bearing versus non-royalty bearing.  This is a breach of the express terms of the Publishing Agreements, as well as the implied covenant of good faith and fair dealing.

65.    Nothing in the Publishing Agreements gives McGraw-Hill the right to depart from the royalty-calculation formula enshrined in the Publishing Agreements to account for what McGraw-Hill believes it contributed to the digital platform that users access with the purchase of an electronic textbook marketed and sold for use on Connect.

66.    Under its new royalty-reducing policy, McGraw-Hill has violated the express terms of the Publishing Agreements and breached the implied covenant of good faith and fair dealing.

## CLASS ACTION ALLEGATIONS

67.    This action is brought by Plaintiffs individually and on behalf of the following class—referred to herein as the "McGraw-Hill Author Class"—which consists of:

All authors of works who entered into a publishing agreement with McGraw-Hill Education, Inc. or one of its predecessors-in-interest whose works have been sold for use on the Connect platform.

68.     The McGraw-Hill Author Class does not include defendant McGraw-Hill, its officers and directors, members of their immediate families, and the heirs, successors or assigns of any of the foregoing.

69.     Plaintiffs reserve the right to modify the McGraw-Hill Author Class, or to propose differing subclasses that satisfy the requirements of Rule 23(b)(3) of the Federal Rules of Civil Procedure.

70.     The Class consists of hundreds of authors and is thus so numerous that joinder of all members is impracticable. The identities and addresses of Class members can be readily ascertained from business records maintained by McGraw-Hill.

71.     The claims asserted by Plaintiffs are typical of the claims asserted by the members of the Class.

72.     Plaintiffs will fairly and adequately protect the interests of the McGraw-Hill Author Class, and do not have any interests antagonistic to those of the other members of the McGraw-Hill Author Class.

73.     Plaintiffs have retained attorneys who are knowledgeable and experienced in breach of contract disputes, as well as class and complex litigation.

74.     Plaintiffs request that the Court afford Class members with notice and the right to opt-out of any class certified in this action.

75.     This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact affecting the Classes predominate over those questions affecting only individual members.  Those common questions include:

(a)   how McGraw-Hill calculates compensation owed to Class members under the Publishing Agreements for works sold for use on Connect;

(b)   whether McGraw-Hill breached its contracts with the Class members by failing to compensate Class members in accordance with the terms of the Publishing Agreements;

(c)   whether McGraw-Hill improperly deducted revenue from the royalty base used to calculate author royalties for Connect by deeming functionalities intertwined with the electronic work as separate and apart from the work;

(d)   whether McGraw-Hill improperly inflated the values of its own contributions to Connect relative to authors' works;

(e)   whether McGraw-Hill misallocated revenue between royalty bearing and non-royalty bearing materials on Connect in bad faith;

(f)   whether McGraw-Hill's deduction of platform fees or design and creation costs from royalty-bearing revenue is a breach of the express terms of the Publishing Agreements;

(g)   whether McGraw-Hill's deduction of platform fees for design and creation costs from royalty-bearing revenue is a breach of the implied covenant of good faith and fair dealing; and

(h)   whether Plaintiffs and Class members are entitled to receive damages as a result of the unlawful conduct by Defendant alleged herein and the methodology for calculating those damages.

76.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(a)     due to the complexity of issues involved in this action and the expense of litigating the claims, few, if any, Class members could afford to seek legal redress individually for the wrongs that defendant committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions, especially due to the potential retaliation Class members may face from McGraw-Hill by prosecuting individual actions;

(b)     when defendant's liability has been adjudicated, claims of all Class members can be determined by the Court;

(c)     this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

(d)     without a class action, many class members would continue to suffer injury, and defendant's violations of law will continue without redress while defendant continues to reap and retain the substantial proceeds of its wrongful conduct; and

(e)     this action does not present any undue difficulties that would impede its management by the Court as a class action.

## FIRST CLAIM FOR RELIEF

## Breach of Contract against McGraw-Hill

77.     Plaintiffs reallege and incorporate all allegations of this complaint as if fully set forth herein.

78.     The subject Publishing Agreements are binding and enforceable contracts.

79. McGraw-Hill has improperly deducted revenues and applied platform fees against works marketed and sold for use on Connect, depriving Class members of royalties they are rightfully owed, and has thereby materially breached the Publishing Agreements.

80. *First*, McGraw-Hill, without any contractual basis, has improperly deducted expenses associated with the development of Connect from the money McGraw-Hill receives for purchases of works marketed and sold for use on Connect (*i.e.*, net receipts). By improperly deducting revenue from the "net receipts" royalty base used to calculate author royalties, McGraw-Hill has systematically underpaid Class members the royalties they are owed under the Publishing Agreements, in breach of those agreements.

81. *Second*, McGraw-Hill has improperly charged authors a Connect platform fee against the money McGraw-Hill receives for purchases of works marketed and sold for use on Connect. By improperly charging authors a Connect platform fee against the "net receipts" royalty base used to calculate author royalties, McGraw-Hill has systematically underpaid Class members the royalties they are owed under the Publishing Agreements, in breach of those agreements.

82. *Third*, McGraw-Hill has improperly and inaccurately overvalued McGraw-Hill's contributions to Connect, such as homework, quizzes, tests, and digital functionalities, and has systematically understated authors' contributions. In other words, McGraw-Hill has failed to accurately allocate revenue received from Connect sales between the royalty bearing works of the authors and the contributions that McGraw-Hill has traditionally treated as a component of operating and administrative expenses. As a result, McGraw-Hill has systematically underpaid Class members the royalties they are owed under the Publishing Agreements, in breach of those agreements.

83.     The use of Class members' works on Connect has also materially breached the implied covenant of good faith and fair dealing in the Publishing Agreements in several respects, including but not limited to the following: Selling the works together with Connect functionalities to dilute the revenue base owed to the Authors, and misappropriating revenues for McGraw-Hill that properly should go to the Authors.  In other words, McGraw-Hill is enriching itself at the expense of authors and taking more of the pie than it is owed.

84.     Plaintiffs have performed all of their obligations under the Publishing Agreements, except to the extent that their obligations have been excused by McGraw-Hill's conduct as set forth herein.

85.     As a direct and proximate cause of McGraw-Hill's material breaches of the express and implied terms of the Publishing Agreements, Plaintiffs Myers, Twenge, and the relevant Class members have been—and will continue to be—damaged as alleged herein in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

1.     Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2.     Awarding Plaintiffs and members of the Class compensatory damages, restitution, disgorgement, and any other relief permitted by law or equity pursuant to the First Claim for Relief;

3.     Awarding Plaintiffs and the Class pre-judgment and post-judgment interest pursuant to their First Claim for Relief, as well as costs;

4.     Awarding Plaintiffs and the Class such other relief as this Court may deem just and proper under the circumstances.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury as to all issues so triable.

Dated: February 8, 2021

*/s/ Chanler A. Langham*
Chanler A. Langham
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Tel: 713-651-9366
Fax: 713-654-6666
clangham@susmangodfrey.com

Kalpana Srinivasan (*pro hac vice* to be filed)
Steven G. Sklaver  (*pro hac vice* to be filed)
Rohit D. Nath  (*pro hac vice* to be filed)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Tel: 310-789-3100
Fax: 310-789-3150
ssklaver@susmangodfrey.com
ksrinivasan@susmangodfrey.com
rnath@susmangodfrey.com

Tamar Lusztig
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019-6023
Tel.: 212-336-8330
Fax: 212-336-8340
tlusztig@susmangodfrey.com

Alexander Aiken (*pro hac vice* to be filed)
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101
Tel.: (206) 516-3880
Fax: (206) 516-3883
aaiken@susmangodfrey.com